# FOR PUBLICATION

FILED & ENTERED

JUL 10 2015

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Fisher    DEPUTY CLERK

1

2

3

4

5

6

7

8

9

10

11

12

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

13 | In re:

14 | Charles A Breul

Debtor(s).

Case No.: 1:05-bk-20645-MT

CHAPTER 7

**MEMORANDUM OF DECISION RE ORDER TO SHOW CAUSE RE CONTEMPT FOR VIOLATIONS OF (1) THE AUTOMATIC STAY; AND (2) THE DISCHARGE INJUNCTION**

On or about October 14, 2005, Debtor Charles Breul ("Debtor") filed a voluntary chapter 7 petition.  He listed Creditors Frank Addamo and Creditors Specialty Service, Inc., collecting for Frank Addamo, ("CSS") as unsecured nonpriority creditors on his schedules.  The chapter 7 trustee determined it was a no asset case.  No objection to discharge was made in Debtor's bankruptcy.  On or about February 10, 2006, Debtor obtained a discharge.

In 2013, Debtor discovered that an abstract of judgment had been recorded post-petition on behalf of Respondents on December 27, 2005 (the "Lien").  On August 20, 2013, Debtor's bankruptcy counsel, Barry Borowitz, contacted CSS to remove the Lien.  Declaration of Barry Borowitz in Support of Motion for OSC, ¶ 3-4 (the "Borowitz Dec.").  Speaking with Borowitz on behalf of CSS, Charles V. Stanley, Jr., president of CSS during all relevant time periods ("Stanley" or collectively with CSS as "Respondents"), first stated that Debtor should have filed a § 522(f) motion.  Id.  After informing Stanley that the Lien was void as it had been recorded during the bankruptcy, Stanley replied

that he would not remove the Lien unless Debtor agreed to pay $7,000.  Id.  On August 23, 2013, Borowitz sent a letter demanding that the Lien be removed.  Id. at ¶ 6.  Borowitz again sent a letter to CSS on November 6, 2013 (the "November Letter").  CSS did not remove the Lien.

On January 21, 2014, Debtor reopened his bankruptcy case.  On January 28, 2014, Debtor filed a Motion for Order to Show Cause (the "Contempt Motion"), requesting that (1) Creditors be held in contempt for violation of the stay and the discharge injunction; (2) that Creditors pay compensatory damages for Debtor's emotional distress and resulting medical assistance, punitive damages, and attorney's fees and costs; and (3) that Creditors immediately remove the Lien.  Debtor alleged that had been applying for refinance of his mortgage and was unable to do so because of the Lien.  As a result, Debtor contended that he missed the period of historically low interest rates.  He is 83-years old and contends that he has suffered great emotional distress because of the alleged violation.  No response to the OSC Motion was filed, and the Court held a hearing on the OSC Motion on February 26, 2014.  The Court then issued the Order to Show Cause re Violation of the Automatic Stay and Discharge Injunction on March 6, 2014 (the "First OSC").  The Court set March 20, 2014 as the response deadline, and the hearing on the First OSC was set for April 3, 2014.  In the meantime, sometime in March 2014, CSS removed the Lien.

At the April 3, 2014 hearing, the Court adopted its tentative ruling and found that there was sufficient evidence that Respondents had engaged in the violative conduct.  Respondents argued, however, that the Motion was not properly served because it was served on "Creditors Specialty Services" instead of "Creditors Specialty Service."  Service was also defective because the Motion was served only on the entity address and not the agent for service of process, as listed with the California Secretary of State.  On April 15, 2014, Debtor re-served the Motion on "Credit Specialty Service, Inc." at both its principal place of business and on its agent for service of process ("Amended Contempt Motion," doc. no. 32).  On April 18, 2014, the Court issued the second Order to Show Cause re Violation of the Automatic Stay and Discharge Injunction (the "Second OSC"), and a hearing was set thereon for May 14, 2014.

On May 2, 2014, CSS filed "Objection/Opposition to OSC re Contempt" (the "First Objection") wherein it asserted that the Second Service was also defective because the Court did not previously have personal jurisdiction over it and thus, under LBR 9020-1(e)(2), it was entitled to be served personally and not by U.S. Mail.  See doc. no. 40.  CSS then requested leave to file written objections and defenses to the allegations made in the Motion.

On May 6, 2014, the Court issued an Amended OSC (the "Amended OSC") that set May 28, 2014 as the new response deadline and set the hearing on June 11, 2014.  On June 9, 2014, CSS filed a two-page response entitled "Objection/Opposition to OSC re Contempt" (the "Second Objection"), wherein it complained, among other things, that its name was incorrect in the Amended OSC.  At the June 11 hearing, the Court ordered that the name of Respondents be corrected on the Amended OSC, and ordered an evidentiary hearing.  The Court set the evidentiary hearing on August 5, 2014 at 10:00 a.m.  A second amended OSC was issued on June 27, 2014 that corrected the spelling

of Respondent CSS' name from "Creditors Specialty Services" to "Creditors Specialty Service." <u>See</u> doc. no. 47.

On August 5, 2014, the parties appeared for the evidentiary hearing. Appearances are as noted on the record. Respondents made several arguments at the hearing that were raised but not fully briefed in the Second Objection. Respondent first argued that they did not receive notice of the bankruptcy prior to recording the Lien on Debtor's property. Without having actual notice of the bankruptcy, Respondents believe that their actions did not constitute a "willful" violation of the automatic stay. Respondents then argued that any claim by Debtor for violation of the automatic stay that occurred in 2005 must be barred by the statute of limitations. Lastly, Respondents defend themselves by placing all blame for conduct that may have violated the automatic stay on their former (now disbarred) attorney, Jay Tenenbaum ("Tenenbaum"). The Court will analyze each of Respondents' defenses in turn.

## **Violation of the Automatic Stay**

The filing of a bankruptcy petition under chapter 11 of the Bankruptcy Code creates an automatic stay which prohibits, *inter alia*, "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title[.]" 11 U.S.C. § 362(a)(1); <u>Snavely v. Miller (In re Miller)</u>, 397 F.3d 726, 730-31 (9th Cir. 2006) ("The stay of section 362 is extremely broad in scope and . . . should apply to almost any type of formal or informal action against the debtor or property of the estate."). An automatic stay arose when Debtor filed the chapter 7 bankruptcy petition on October 14, 2005. The automatic stay remained in effect to bar actions against Debtor until entry of the discharge and discharge injunction on February 10, 2006. 11 U.S.C. § 362(c)(2)(C); <u>Zilog, Inc. v. Corning (In re Zilog, Inc.)</u>, 450 F.3d, 996, 1009 (9th Cir. 2006). ("[T]he stay of any other act under subsection (a) of this section continues until the earliest of — . . . the time a discharge is granted or denied[.]")

Consequently, any attempt by Respondents to commence or continue an action against Debtor to collect on an alleged debt between October 14, 2005 and February 10, 2006 would constitute a violation of the automatic stay. In <u>Knupfer v. Lindblade (In re Dyer )</u>, the Ninth Circuit held that the post-bankruptcy petition recordation of a deed of trust by a creditor was a willful violation of the automatic stay because the creditor "had an affirmative duty to remedy his automatic stay violation ... such as by attempting to undo the recordation process." <u>Knupfer v. Lindblade (In re Dyer )</u>, 322 F.3d 1178, 1191–92 (9th Cir.2003). Respondents recorded the Lien on Debtor's property on or about December 27, 2005. It is undisputed that Respondents' actions in recording the Lien violated the automatic stay. The Court first addresses whether the violation was willful.

1

2

        Respondents had actual notice of the bankruptcy

3          Section 362(k) permits sanctions for willful violations of the automatic stay under
§ 362(a). "A willful violation is satisfied if a party knew of the automatic stay, and its

4    actions in violation of the stay were intentional." Eskanos & Adler, P.C. v. Leetien, 309
F.3d 1210, 1215 (9th Cir.2002) (citing Pinkstaff v. United States (In re Pinkstaff), 974

5    F.2d 113, 115 (9th Cir.1992)). Once a creditor has knowledge of the bankruptcy, it is
deemed to have knowledge of the automatic stay. Ramirez v. Fuselier (In re Ramirez),

6    183 B.R. 583, 589 (B.A.P. 9th Cir. 1995).  There is no dispute that CSS intended to
have the deed recorded when it sent Debtor's file to Tenenbaum, in accordance with

7    CSS' standard procedures.  Tr. of Evid. Hr'g, 87:21 – 88:22.

8
           As stated above, Debtor filed his voluntary chapter 13 petition on October 14,

9    2005.  On October 22, 2005, the Court sent notice of the bankruptcy filing to all
scheduled creditors via first class mail.[1]  Both Respondents are listed on the Certificate

10   of Service (the "CoS").  See BNC Certificate of Mailing, ECF doc. no. 3.  CSS was listed
on the CoS as "Credit Specialty Svc Inc, POB 764, Acton, CA, 93510-0764 (the "Acton

11   POB").  A second notice was mailed by the Court on or about February 12, 2006,
notifying creditors of Debtor's discharge (the "Discharge Notice," and collectively with

12   the CoS as "the Bankruptcy Notices").  See Id.; Discharge of Debtor in a Chapter 7

13   Case, ECF doc. no. 12.

14
           At the evidentiary hearing, Stanley testified that the Acton POB was an address

15   at which CSS receives mail.  Tr. of Evid. Hr'g, 97:8-13.  Stanley also testified that in
2005, he was the only person that opened mail sent to CSS.  Id. at 90:7-9.  While

16   Stanley did not admit to having received the Bankruptcy Notices in 2005, he did admit

17   that he received the letter sent by Borowitz in November 2013 that was sent to the
Acton POB. Id. at 94:5-19.  Stanley explained that Acton is a rural area and his office is

18   next door to a veterinarian.  Id. at 103:23.  Stanley believes that the two notices may
have been mistakenly delivered to the veterinarian, as he stated that such erroneous

19   deliveries are made on a consistent basis.  Id. at 103:23-25.  Stanley also testified that

20   he often receives returned mail that is not even addressed to him.  Id. at 104:1-6;
111:20 – 112:2.  On redirect, counsel elicited testimony from Stanley about how he

21   believed that the misspelling of CSS' name on the Bankruptcy Notices may have
resulted in them not being delivered.  Id. at 112:3-10.  CSS argued that "there are

22   different credit card companies, different banks that go by different versions of the same

23   name 'Credit'."  Id. at 118:19 – 119:1.

24         The mailing of a properly addressed and stamped item creates a rebuttable
presumption that the addressee received it. Moody v. Bucknum (In re Bucknum), 951

25   F.2d 204, 207 (9th Cir.1991). A certificate of mailing raises the presumption that the
documents sent were properly mailed and received. Id.; Cossio v. Cate. (In re Cossio),

26   163 B.R. 150, 155 (9th Cir. BAP 1994), aff'd mem., 56 F.3d 70 (9th Cir.1995).  Stanley's

27   assertion that the misspelling of CSS' name on the mailings led to him not receiving the

28   _____
[1] The Court has exercised its discretion to take judicial notice of the documents filed in the bankruptcy pursuant to
FRE 201, as made applicable to bankruptcy proceedings by FRBP 9017.  See Pizza of Hawaii, Inc. v. Shakey's, Inc.
(In re Pizza of Hawaii), 761 F.2d 1374, 1379 (9th Cir. 1985).

Bankruptcy Notices is not convincing.  Stanley's testimony at the evidentiary hearing that he did not receive the notices sent by the court during the pendency of the bankruptcy was not credible and sounded rehearsed.  In his responses to Debtor's counsel's questions, Stanley often seemed amused and disdainful of the seriousness of the allegations against his company CSS.  Stanley would have the Court believe that he received the November 2013 letter that was addressed to the Acton POB, but that he did not receive the two Bankruptcy Notices sent by the Court to the same address. One misdirected notice is plausible; two are not, especially where the same address was used in all instances. Stanley's far-fetched theory that using "Credit" instead of "Creditors" as the first word in the company's name would result in two mailings being misdelivered is spurious, particularly in light of Stanley's testimony that he "often receives returned mail not even addressed to him." Tr. of Evid. Hr'g, 104:1-6; 111:20 – 112:2.  If Stanley receives mail at the Action POB that is not even addressed to him, it defies credulity that he wouldn't receive mail addressed to him merely because the mail omitted the last three letters of the first word of the business' name.

Stanley did not present any evidence to rebut the presumption that he received notice of the bankruptcy.  There was no evidence presented to show that there are other businesses with a similar name that operate in the same zip code or area. Stanley even stated that the veterinarian that operates the business next door erroneously receives his mail "constantly". Id. at 103:20-25.  Stanley could not know that his mail is misdelivered "constantly" unless said veterinarian later walks the mail over to Stanley's office.  It is not believable that the veterinarian would not have done the same with correspondence from a federal court. Furthermore, Stanley's entire business is collections; he should be (and indeed, judging by his testimony, is) acutely aware of receiving correspondence from bankruptcy courts.  These facts further undermine Stanley's testimony.

These evidentiary presumptions, and CSS' failure to rebut them, suffice to establish that Respondents received notice of the bankruptcy on or about October 22, 2005.  As CSS had actual notice of the bankruptcy before the Lien was recorded in violation of the stay, the violation was willful under §362(k).

Respondents are liable for the actions of their agent Jay Tenenbaum

Another argument made by CSS at the hearing, yet not raised in their Opposition, is that it was not directly involved "in a way that would be contemptuous with the recording of the abstract on December 27, 2005.". Tr. of Evid. Hr'g, 121:7-18. CSS laid the blame at the feet of their former, now-disbarred attorney Tenenbaum for recording the Lien in violation of the stay. Id. at 121:7-18.  Tenenbaum was CSS' attorney of record in 2005. Id. at 100:10-12.  Stanley testified that Debtor's judgment debt to Addamo was assigned to CSS sometime in the middle of 2004. Id. at 86:23 – 87:2.  Stanley stated that it was his practice to give the file to Tenenbaum within a month of it being assigned to CSS to record the Lien. Id. at 88-5-13.  Stanley also testified that neither he, nor anyone else at CSS, directed Tenenbaum to record the Lien in 2005. Id. at 90:20 – 91:2.  It is Stanley's position that, if there was a violation of the stay, it was the actions of Tenenbaum and not CSS.  Stanley testified that he did not make any affirmative inquiry of Tenenbaum after turning over Debtor's file to him

sometime in 2004.  Tr. of Evid. Hr'g, 107:11 – 109:19.

The conduct of an attorney is attributable to the client. See Seacall Development v. Santa Monica Rent Control Bd., 86 Cal. App. 4th 201, 204-205 (Cal.Ct.App. 1999) (citing Carroll v. Abbott Labroatories, 32 Cal. 3d 892, 895, 898 (1982)).  Stanley's testimony was that CSS retained Tenenbaum to "handle abstracts of judgment."  Id. at 87:21 – 88:4.  "Normally, the conduct of an attorney is imputed to his client, for allowing a party to evade 'the consequences of the acts or omissions of [ ] his freely selected agent' 'would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent' " Santiago-Monteverde v. Pereira (In re Santiago-Monteverde), 512 B.R. 432 (S.D.N.Y. 2014) (quoting S.E.C. v. McNulty, 137 F.3d 732, 739 (2d Cir.1998)).

Here, Stanley's own testimony supports the finding that Tenenbaum was CSS' lawyer and agent, and acted with the authority of CSS to record abstracts judgments on its behalf.  If CSS believes that Tenenbaum should be liable for any of the damages awarded due to the violation of the stay, it is free to exercise its rights against Tenenbaum for any alleged negligent malpractice that occurred; but, here, its reliance on Tenenbaum will not shield CSS from liability for the actions of its agent.

It is also Stanley's routine business practice to record such abstracts of judgment. He pointed to no system to interrupt the recording if a bankruptcy is filed before his counsel gets around to executing his instructions, something that should be essential to any responsible collection business to avoid violation of the stay.  See Tr. of Evid. Hr'g, 108:4-109:19.

Debtor's Claim for Damages is Not Barred by Any Applicable Statute of Limitations

Respondent's next argument focuses on the lag between when the Lien was recorded, and when the OSC Motion was filed.  Respondent believes that there is a statute of limitations defense to Debtor's allegations.  To support this assertion, Respondent cites Salisbury v. Mirage Resorts, Inc. (In re Mizuno), 223 F.3d 1050 (9th Cir. 2000).

Respondent's reliance on Mizuno is misplaced, as that case focused entirely on the two year statute of limitations under 11 U.S.C. § 546.  In Mizuno, a Japanese land developer defrauded thousands of Japanese investors in a golf course and country club development.  Mizuno, 223 F.3d at 1051.  The debtor used some of the money to pay gambling debts and make preferential transfers in the United States. Id.  Mirage Resorts, Inc. appealed from an order of the district court, reinstating an adversary proceeding instituted against them under § 546 by the Chapter 11 Trustee. Id. at 1052. The bankruptcy court had determined that the adversary proceeding was barred by the applicable statute of limitations. Id. at 1053.  Plaintiff trustee then appealed and the district court reversed, finding that the action was timely filed.  Id.  Under 11 U.S.C § 546(a), the Ninth Circuit concluded that, as Salisbury was the first and only trustee actually appointed, the new statute of limitation began to run on the date of his appointment, and the adversary action was timely filed. Id. at 1055.

In the <u>Mizuno</u> decision, the Ninth Circuit did not have the question of whether there exists a statute of limitations for actions under § 362(k). CSS provided no authority other than <u>Mizuno</u> to support this contention. In fact, Congress did not establish any limitations period for damage claims under § 362(k). <u>Stanwyck v. Bogen</u>, 450 B.R. 181, 193 (Bankr. C.D. Cal. 2011) (citing <u>In re Bernheim Litigation</u>, 290 B.R. 249, 258 (D.N.J. 2003)); <u>Koffman v. Osteoimplant Technology, Inc.</u>, 182 B.R. 115, 124 (D. Md. 1995) ("Congress did not enact a statute of limitations on actions under section 362(h) . . . ."); <u>Nelson v. Post Falls Mazda (In re Nelson)</u>, 159 B.R. 924, 925 (Bankr. D. Idaho 1993). Debtor took action very quickly after the violation of the stay came to his attention and he never slept on his rights. He would have no reason to check his property records since he was not transferring the property or refinancing the mortgage until 2013.

### Measure of Damages re Violations of Automatic Stay

11 U.S.C. § 362(k)(1), states that "an individual injured by any willful violation of a stay ... shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." Actual damages include "fees … properly allocable to efforts to enforce the automatic stay," but once the violation has ended, "any fees the debtor incurs after that point in pursuit of a damage award would not be to compensate for actual damages under 362(k)(1)." <u>Sternberg v. Johnson</u>, 595 F.3d 937, 947 (9th Cir. 2009).

As it took the filing and pursuit of the Contempt Motion to finally force CSS to remove the Lien, it is appropriate to award Debtor his reasonable attorney's fees and costs for prosecuting the Contempt Motion. Stanley testified that the Lien was removed on or about March 2014. <u>Tr. of Evid. Hr'g</u>, 95:12-16. Thus, under <u>Sternberg</u>, any attorney's fees incurred by Debtor before March 2014 in connection with bringing the OSC Motion to enforce the stay would be compensable under § 362(k). Debtor contended that the attorney's fees related to the OSC Motion are $7,750. <u>Amended OSC Motion</u>, 8:10-11. Of the $7,750, Debtor is entitled to recover $1,453.13, the portion allocable to remedying the violation of the stay. These fees are very reasonable given the amount of work done by counsel to remedy this violation.

### Standard for Violation of Discharge Injunction

Section 524 of the Bankruptcy Code recites the effect of a discharge:

(a) A discharge in a case under this title—
(1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under [§ 727], whether or not discharge of such debt is waived;
(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived[.]

1

2      A party injured by a violation of the discharge injunction has no private cause of
action for damages under § 524 or § 105. Walls v. Wells Fargo Bank, 276 F.3d 502, 504

3  (9th Cir.2002). Rather, a violation under § 524(a) is enforced through the bankruptcy
court's contempt authority under § 105(a). Renwick v. Bennett (In re Bennett), 298 F.3d

4  1059, 1069 (9th Cir.2002); Walls, 276 F.3d at 507.

5      The court's contempt authority under § 105(a) is only a civil contempt authority
and allows only for civil sanctions as the appropriate remedy. In re Moreno, 479 B.R.

6  553, 569 (Bankr.E.D.Cal. 2012) (citing Knupfer v. Lindblade (In re Dyer), 322 F.3d 1178,

7  1192 (9th Cir.2003) (considering contempt sanctions in context of stay violation)). Civil
sanctions must either be compensatory or designed to coerce compliance. Id. (internal

8  citation omitted). For a discharge violation, "compensatory civil contempt allows an
aggrieved debtor to obtain compensatory damages, attorney's fees, and the offending

9  creditor's compliance with the discharge injunction." Walls, 276 F.3d at 507.

10
       "[T]he [aggrieved debtor] seeking contempt sanctions has the burden of proving,
11  by clear and convincing evidence, that the sanctions are justified." ZiLOG, Inc. v.
Corning (In re ZiLOG, Inc.), 450 F.3d 996, 1007 (9th Cir.2006). And to justify sanctions,

12  the debtor must prove (1) that the offending creditor knew the discharge injunction was
applicable and (2) that the creditor intended the actions which violated the injunction.

13  Bennett, 298 F.3d at 1069 (citation omitted). After the debtor meets his/her burden, the
burden then shifts to the creditor to demonstrate why it was unable to comply with the

14  discharge injunction. See id. (citation omitted).

15
       CSS violated Debtor's discharge injunction by failing to timely remove the Lien
16

17      Stanley was contacted by Debtor's counsel on or about August 20, 2013, who
requested that the Lien be removed because it was recorded in violation of the stay.

18  Borowitz Dec., ¶ 8-14; Tr. of Evid. Hr'g, 91:10-17.  Prior to having been contacted by
Borowitz, Stanley testified that he had spoken with Debtor sometime in July or August

19  2013 about the Lien.  Tr. of Evid. Hr'g, 91:17-92:6.  Stanley indicated in his personal
notes that Debtor stated that he filed for bankruptcy in 2006.  Id.  Stanley did not look at

20  his bankruptcy, and did not ask Debtor for his case number.  Id. at 92:3-6.  Then, on
August 20, 2013, Stanley was then contacted by phone by Borowitz, who also informed

21  Stanley that the Lien was void and needed to be removed because it was recorded in

22  violation of the stay and failure to do so would violate the discharge injunction as well.
Borowitz Dec., ¶ 4-8; Tr. of Evid. Hr'g, 93:2 – 94:2.  In response to these demands,

23  Stanley did nothing; he failed to make reasonable inquiry about whether CSS recorded

24  a Lien in violation of the stay to determine if corrective action was required on his part.

25      CSS continued with its flagrant violation, even after being sent a letter on
November 6, 2013 by Borowitz demanding that the Lien be removed.  Stanley testified

26  that his plan, after receiving the November Letter, was to "speak with [his counsel's]
office and ask [his counsel's] advice as to what we should do regarding the lien…"  Tr.

27  of Evid. Hr'g, 94:20-24.  Stanley, however, took no action to remove the Lien until

28  February 2014 – three months later.  Tr. of Evid. Hr'g, 98:20-100:4; 105:18-107:4.
Stanley's testimony that he had a difficult time meeting "over the holidays" with his

1   counsel was not credible and, in fact, is indicative of Stanley's lack of attention to the
2   import of both the automatic stay and the discharge injunction.  The Court takes judicial
    notice of the fact that there were eighty-three business days, not including holidays,
3   between the date the November letter was likely received and when Stanley testified
    that the Lien was removed.[2]  Under these circumstances, where CSS and Stanley are
4   sophisticated creditors that understand the timeline of bankruptcy stays and discharge
    injunctions[3], the delay in removing the Lien once Respondents were put on notice that
5   its continued encumbrance of Debtor's property was violating Debtor's discharge
    injunction was not timely and was inexcusable.
6

7               Debtor has Demonstrated that Sanctions are Justified

8                   *CSS knew of the discharge injunction was applicable as of August 2013*

9           A party cannot be held in contempt for violating an injunction absent actual
10  knowledge of that injunction, and whether a party had such knowledge is a question of
    fact. ZiLOG, 450 F.3d at 1008 (citations omitted). Stanley testified that he spoke with
11  Debtor sometime in July or August 2013 about the Lien and his discharge.  Tr. of Evid.
    Hr'g, 91:17-22.  Stanley stated that he did not investigate Debtor's bankruptcy and he
12  did not ask Debtor for his case number.  Id. at 92:3-4.  Stanley then spoke with Debtor's
    counsel Borowitz in August 2013, and was again informed that the Lien was recorded in
13  violation of the automatic stay and that the continued existence of the Lien was violating
    Debtor's discharge[4].
14

15          Stanley's business is collecting debts and, as stated above, he is quite familiar
16  with mechanisms of bankruptcy – and the information provided by Debtor and Borowitz
    was more than sufficient to give Stanley actual knowledge that the discharge injunction
17  was implicated.

18                  *CSS's delay in removing the Lien, and its request for money in exchange
19                  for removing the Lien, was intentional*

20          As explained above, Stanley and CSS knew that Debtor's discharge injunction
    was implicated when he spoke with both Debtor and Borowitz in August 2013.  Stanley
21  explained that his standard business practice was to demand money to release a Lien
    post-bankruptcy.
22

23

24

25  ────────────────────────
    [2] The Court has exercised its discretion to take judicial notice of the time elapsed between the November Letter and
26  the removal of the lien pursuant to FRE 201(b)(2), as made applicable to bankruptcy proceedings by FRBP 9017.
    [3] See Tr. of Evid. Hr'g at 89:21-90:6;  100:23-102:3
27  [4] Borowitz testified that, on August 23, 2013, he sent a letter to Stanley regarding the violations of the stay and
    discharge injunction, but that his office did not retain a signed copy of that letter so it was not tendered as evidence.
28  Tr. of Evid. Hr'g, 70:20-25.  The Court found Borowitz's testimony of the existence of the August 23 letter to be
    credible, and the November Letter references the August 23, 2013 letter.  As that letter was not submitted here, the
    conversations Stanley had with both Debtor and Borowitz are sufficient to find that Stanley had notice of the
    discharge injunction in late August, 2013.

1

2
… so I told [Debtor] I believe he needed to go file a motion to avoid a
judicial lien.  I've done this in the past.  Debtors seem to have an option.

3
One is to be able to file a motion to avoid a judicial lien … or in lieu of that,
he could make a payment to us, the balance on the account was $15,000.

4
I offered to release it for seven.

5
Tr. of Evid. Hr'g, 92:4-15.  See also id at 94:7-15.

6

7
        When confronted with the fact that the continued existence of the Lien violated
Debtor's discharge injunction, Stanley failed to make reasonable inquiry about whether

8
CSS recorded the Lien in violation of the stay to determine if corrective action was
required on his part.   Stanley instead presumed to give Debtor legal advice by telling

9
him to go file a motion in the bankruptcy case to avoid the Lien or pay him $7,000 to
release it.  Tr. of Evid. Hr'g, 92:3-15.  This is not the act of an unsophisticated creditor,

10
confused about how his rights were impacted by the discharge injunction.  Stanley's
request for money to remove a Lien recorded in violation of the stay, the continued

11
existence of which also violated the discharge injunction, was intentional.  This finding is
supported by Stanley's own testimony about how he's "done this in the past" and that

12
requesting money to remove a Lien during a bankruptcy is "a very common

13
conversation [Stanley] has with bankruptcy attorneys…." Tr. of Evid. Hr'g, 94:9-15.

14
                    *CSS presented no evidence that it was unable to comply with the*
                    *injunction*

15

16
        As explained above, in August 2013, Stanley had knowledge that the recording
of the Lien violated the stay and its continued existence was violating the discharge

17
injunction.  In the Court's view, this is sufficient evidence of reckless or callous disregard
by CSS for the discharge injunction and for Debtor's rights under the Code to impose

18
punitive damages.  See Snowden v. Check Into Cash of Washington Inc. (In re
Snowden), 769 F.3d 651, 657 (9th Cir. 2014) (affirming an award of punitive damages

19
based on evidence that of reckless or callous disregard for the law or rights of others).

20
With such knowledge, if given the attention and inquiry it merited, Stanley could have
moved quickly to remove the Lien in August or September of 2013 and perhaps

21
mitigated the damage done to Debtor's attempt to refinance the mortgage on his home.
Instead, Stanley blithely advised Borowitz, an attorney and certified bankruptcy

22
specialist, that Debtor needed to file a motion to avoid the Lien under 11 U.S.C.

23
§ 522(f).  Tr. of Evid. Hr'g, 81:5-10; 92:3:15.

24
        Stanley's cavalier attitude regarding the existence of the discharge injunction
continued for several months, even after being sent another letter in November 2013.

25
Instead of reacting as someone with knowledge of the strict nature of bankruptcy and its
protections, as was clearly demonstrated by Stanley's testimony, Stanley purposefully

26
delayed for two *more* months before acting to remove the Lien.  Stanley continued to

27
allow the Lien to violate Debtor's discharge injunction until he could get around to
speaking with his attorney (instead of perhaps contacting another, more responsive

28
attorney).  Uncertainty regarding his rights under bankruptcy law (giving Stanley the
benefit of the doubt as to his ostensible reason for not removing the Lien immediately),

1  is not a sufficient reason to delay action for six months.

2      Once Stanley finally decided that he would release the Lien, he "typed" the
3  papers in February and recorded the release in March 2014, which shows that there
  was nothing, except his own prevarication and perhaps his hope that Debtor would pay
4  him to just go away, that prevented him from releasing the Lien when he learned that it
  was violating Debtor's discharge injunction. Id. at 95:12-19.
5

6  <u>Measure of Damages re Violations of Discharge Injunction</u>

7  *Compensatory Damages for Loss of Refinance Contract*

8      In June 2013, Debtor sought to refinance his home through the Home Affordable
  Refinance Program ("HARP") and contacted Bank of America to determine if he was
9  eligible for such relief. <u>Declaration of Charles Bruel in Support of Debtor's Motion (the</u>
10 <u>"Bruel Dec.").</u> Debtor was sent a letter in June 2013 from Bank of America ("BofA"),
  explaining his options for refinancing the mortgage on his home. <u>Bruel Dec.</u>, 2:19-21;
11 Ex. 6. At the time of his initial contact with BofA, Debtor's monthly mortgage payment
  was $588; BofA offered a refinance contract at an estimated 3.75% fixed interest rate.
12 <u>Id.</u>, 2:22-26; Ex. 6. Debtor calculated that the proposed refinance would bring his
13 payment down to $417 per month, saving him approximately $171 per month, or $2,052
  per year. <u>Id.</u>
14
    It was only after BofA checked Debtor's credit that the Lien was discovered. <u>Id.</u>
15 at 3:1:6. After the Lien was discovered, BofA informed Debtor that it would not go
  forward with the refinance contract until the Lien was removed. <u>Id.</u> at 55:3-7. Debtor
16 argued that because his credit worthiness was reduced by the existence of the Lien,
17 Debtor was offered a 4.5% interest rate and was instructed to pay off the debt secured
  by the Lien or somehow have the Lien removed. <u>Id.</u> at 3:1-7. The increase in the
18 offered interest rate would have raised the monthly payment to $446.72. <u>Id.</u> at 8-9. On
  or about March 7, 2014, Debtor contacted BofA and was informed that, if the Lien was
19 removed, the loan could be refinanced at 4.75%, for a monthly payment of $459 per
20 month. Because Debtor was unable to refinance at the low interest rates offered at the
  time he initially contacted BofA, his payments remained $588, causing him damage of
21 $2,052 for the year between July 2013 and July 2014. <u>Id.</u> at 3:13-14.

22     The damage wreaked by Stanley's inaction did not end there. The existence of
23 the Lien stymied Debtor's attempt to refinance his home loan and lower the interest rate
  from the original 6.5% to 3.75%. Debtor calculated his damages resulting from
24 Stanley's refusal to correct his violative actions by comparing 3.75% rate that he would
  have been eligible to receive to the amount of his payment if he had refinanced at the
25 4.75% rate offered after the Lien was discovered. Debtor estimated the damage, over
26 the 30 year life of the loan, to be approximately $15,120 (in addition to the $2,052 listed
  above).
27
    There is nothing in the record that suggests that Debtor could not have
28 refinanced his mortgage, had Stanley promptly removed the Lien. Debtor had no
  outstanding debt, no credit cards, and no automobile loan, and had never been late

1  making his mortgage payment.  Tr. of Evid. Hr'g, 36:14-18; 51:2-13; 50:6-7.
2  Respondents offered no evidence to rebut Debtor's evidence as to his damages from
   his sabotaged refinance efforts.  Debtor's testimony at the hearing demonstrates that he
3  got confused as to the criteria involved in assessing the HARP refinance, but the
   evidence submitted shows that Debtor was indeed offered a refinance of his home loan
4  and that the interest percentage did increase between the initial contact and the last
   contact Debtor had with BofA.  See Bruel Dec., Ex. 6; Ex. 8.
5
6       After attempting to negotiate with Stanley on his own behalf, and after having his
   attorney meet the same wall of obstinacy that he did, it was clear from his testimony that
7  Debtor was tired of fighting and just gave up any hope of refinancing his loan.  Debtor,
   who went through the extreme unction of a chapter 7 bankruptcy case, was disillusioned
8  with the system of protections that were to have been his after discharge.  Debtor
   testified that, "I don't really trust anyone anymore.  This is just the way this whole thing
9  has made me feel…" and that this experience has made it so that Debtor hopes he
10 "never, ever see[s] another bank or attorney."  Tr. of Evid. Hr'g at 47:17; 63:22-64:1.
11      The damage to Debtor's refinance efforts cannot be attributed completely to
   Stanley's actions.  On or about March 7, 2014, Debtor was informed by BofA that he
12 was likely still eligible for an HAMP refinance.  Bruel Dec., Ex. 9.  Debtor indicated that
   the proposed refinance would increase his principal by approximately $5,000 and that
13 he is "afraid to add any more to my principal" and that he is "scared to death" to touch
14 his mortgage at this time.  Id. at 40:2:13; 41:14-42:14.  Debtor's interactions with BofA
   and the complicated mess that was the result of the void Lien not being timely removed
15 caused him to abandon the refinance.  See Tr. of Evid. Hr'g at 63:22-64:1.
16
17      In fairness, the total amount of Debtor's damage for the sabotage of his efforts to
   refinance his home loan, calculated by Debtor as $17,172, cannot be laid completely at
18 the feet of Respondents.  It is clear from Debtor's testimony and the evidence presented
   in support, however, that he was moving forward with the refinance process until he hit
19 the obstacle of the void Lien.  It was only after the wearying process of overcoming
20 Stanley's steadfast refusal to remove the Lien that just wore the elderly Debtor down
   until he just gave up.
21      Having considered the testimony and evidence presented, the Court finds that
22 the damage attributable to Respondent for the disruption of Debtor's refinance of his
   home loan to be $8,000.  Although missing the lowest interest rate would cause
23 damages over a 30 year loan, there was no indication that an 83-year old would
   maintain the loan for 30 years. In addition, Debtor is entitled to recover their reasonable
24 attorney fees incurred in prosecuting this portion of the Show Cause motion.  Debtor
   contended that the attorney's fees related to the OSC Motion are $7,750.  Amended
25 OSC Motion, 8:10-11.  Of the $7,750, Debtor is entitled to recover $6,296.87, the
26 portion allocable to remedying the violation of the discharge injunction.  These fees are
   very reasonable given the amount of work done by counsel to remedy this violation.
27
28

1

2

*Emotional distress damages are warranted*

3
      There is no controlling law in the Ninth Circuit related to emotional distress
damages for violation of the discharge injunction.  The bankruptcy court for the District

4
of Oregon examined both the availability of emotional distress damages for violations of
the automatic stay, and the legislative history of the discharge injunction.  See In re

5
Feldmeier, 335 B.R. 807 (Bankr.D.Or. 2005).  The Feldmeier court found that the

6
legislative history of the discharge injunction, like that of the automatic stay, showed that
Congress recognized that the injunction is intended to protect more than financial

7
interests. Id. at 813-14 (quoting H.R.Rep. No. 595, 95th Cong, 1st Sess 365–366
(1977); S. Rep no. 989, 95th Cong.2d Sess 80 (1978), U.S.Code Cong. & Admin.News

8
1978, pp. 5963, 6321, 5787, 5866). The prohibition of further collection efforts after
discharge is intended to "insure that once a debt is discharged, the debtor will not be

9
pressured in any way to repay it." Id. Thus, the Feldmeier court held that the contempt

10
remedy, which provides for an award of "compensatory damages," should include
compensation for emotional distress suffered by a debtor as a result of a creditor's

11
willful violation of the discharge injunction. Id. at 814.  See also Snowden v. Check Into
Cash of Wash., Inc. (In re Snowden), 769 F.3d 651 (9th Cir. 2014).

12

13
      While "pecuniary loss is not required in order to claim emotional distress
damages," the Ninth Circuit has held that "not every willful violation [of the automatic

14
stay] merits compensation" for such damages. Dawson v. Washington Mut. Bank, F.A.
(In re Dawson), 390 F.3d 1139, 1149 (9th Cir. 2005). The Ninth Circuit held instead that:

15
"to be entitled to damages for emotional distress under § 362(h), an individual must (1)
suffer significant harm, (2) clearly establish the significant harm, and (3) demonstrate a

16
causal connection between the significant harm and the violation of the automatic stay.

17
Snowden, 769 F.3d at 656-657.  Fleeting or trivial anxiety or distress does not suffice to
support an award; instead, an individual must suffer significant emotional harm."

18
Dawson, 390 F.3d 1139 at 1149.  The Ninth Circuit held that such harm could be
established "in several different ways" including "[c]orroborating medical evidence,"

19
testimony by "non-experts, such as family members, friends, or coworkers" as to
"manifestations of mental anguish [which] clearly establish that emotional harm

20
occurred." In addition, the court held that "[i]n some cases significant emotional distress

21
may be readily apparent even without corroborative evidence" such as when a creditor
engages in egregious conduct "[o]r, even if the violation of the automatic stay was not

22
egregious, the circumstances may make it obvious that a reasonable person would
suffer significant emotional harm." Id. at 1149-1150.

23

24
      Here, Debtor presented no *medical* evidence to show that he suffered emotional
distress. Debtor did, however, testify as to the stress caused to him by having the

25
refinance of his home sabotaged. Stanley's conduct in demanding $7,000 to release the

26
void Lien, coupled with the fact that he failed to make even the most cursory inquiry and
failed to act for six months was egregious conduct. Moreover, Stanley showed not the

27
least bit of compassion or empathy for an 83-year old man who has no income other
than his monthly Social Security disbursements who was attempting to refinance his

28
home to save him thousands of dollars.  Debtor was very candid in explaining that
"everything I have been through from when I started to get the loan and discovering that

there is a lien on that, everything else, pardon the expression but it scared the hell out of me." Tr. of Evid. Hr'g at 44:16-24.  Debtor testified that he is "scared to death" to touch his mortgage, and that he witnessed too many of his friends who had lost their homes and he never wanted to be in that position.  Id. at 40:12-18; 44:25-45:2.

The Court finds that a "reasonable person" would suffer significant emotional harm from Stanley's conduct in attempting to extort $7,000 on a discharged debt and for Stanley's callous and lackadaisical attitude in remedying these violations. Not only was Stanley's conduct a willful violation of the discharge injunction, there can be no doubt about the intent to cause the emotional distress suffered by Debtor. What other result could there have been when Stanley's response after being apprised of his violative conduct was to remain obdurate and cause enough distress for a debtor to pay a discharged debt?  This Court finds that Debtor is entitled to emotional distress damages in the amount of $5,000.

### *Punitive Damages are Warranted, Given CSS' Routine Business Practice of Violating the Essential Injunctive Relief Afforded Debtors and Discharged Debtors*

An award of punitive damages requires "some showing of reckless or callous disregard for the law or rights of others." In re Bloom, 875 F.2d 224, 228 (9th Cir. 1989). The Court also finds it not only appropriate to award punitive damages, but necessary. Stanley, acting on behalf of CSS, has given every indication that he is and will remain indifferent to the statutory significance of the discharge injunction and the harm caused to the debtors who have abided by their responsibilities under the Code as debtors, unless he is compelled to take note.  This result is also supported by the finding above that Stanley employs no system for ensuring that liens are not recorded in violation of the automatic stay or discharge injunction, once the paperwork to record a judgment lien is sent to whomever acts as his attorney.  Tr. of Evid. Hr'g, *supra* at 108-109.

The Lien was released on March 12, 2014.[5]  The Court finds that the appropriate measure of punitive damages for CSS' violation of Debtor's discharge injunction is $9,750.  This amount represents $50 per day from August 23, 2013, the date when Stanley had actual knowledge that the stay and discharge injunction were violated, through March 12, 2014, when the violation ceased. This punitive sanction is commensurate with CSS' offense, the significance of which derives from the duration of the offense which was, at all times, directly in Stanley's control and Stanley's sophistication regarding bankruptcy processes demonstrates knowledge of the seriousness of the violations.

//

//

//

---

[5] See Tr. of Evid. Hr'g, 128:17.

1

2          These compensatory, emotional distress, and punitive damage awards are

3    payable within 30 days of the date of entry of the final order.  Debtor's counsel is to

     lodge an order consistent with this Memorandum within 7 days of its entry.

4
                                                    ###
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Date: July 10, 2015

                                          _____
26                                        Maureen A. Tighe
                                          United States Bankruptcy Judge
27

28

-15-